## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

|                                 |     |                                    |
|---------------------------------|-----|------------------------------------|
| **STACEY TILLIS**               | )   |                                    |
| **Plaintiff,**                  | )   |                                    |
|                                 | )   |                                    |
|                                 | )   |                                    |
| **vs.**                         | )   | **CIVIL ACTION NO. 2:15-333-CG-C** |
|                                 | )   |                                    |
| **RAY S. BLANKS and CITY OF**   | )   |                                    |
| **SELMA, ALABAMA,**             | )   |                                    |
| **Defendants.**                 |     |                                    |

## <u>ORDER & MEMORANDUM</u>

This matter is before the Court on Plaintiff Stacey Tillis's ("Tillis") and
Defendants Ray S. Blanks ("Blanks") and the City of Selma's (the "City") cross-
motions for summary judgment. A hearing being unnecessary, the Court considers
the motions on the basis of Defendants' motion and memorandum (Doc. 13),
Plaintiff's response (Doc. 26), and Defendants' reply (Doc. 29), and of Plaintiff's
motion and supporting documents (Docs. 14–16), Defendants' response (Doc. 25),
and Plaintiff's reply (Doc. 30). After due consideration, the Court finds it proper to
**GRANT** Plaintiff's motion in part and to **DENY** Plaintiff's motion in part; the Court
further **GRANTS** Defendants' motion in part and **DENIES** Defendants' motion in
part.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) instructs, "[t]he court shall grant
summary judgment if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." The trial

court's mission is to "determine whether there is a genuine issue for trial" and not to "weigh the evidence." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The burden is on the moving party to show that there is no genuine dispute as to any material fact. *Id.* at 256. In conducting its summary judgment analysis, the Court must construe all evidence "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

After the movant meets its burden, the burden shifts to the nonmoving party "to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the nonmoving party fails to do so, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Further, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

With specific respect to the resolution of a summary judgment motion based on qualified immunity, the Eleventh Circuit has declared:

> [W]e approach the facts from the plaintiff's perspective because "[t]he issues appealed here concern not which facts the parties

> might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. *See Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

*McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

## II. Background

Tillis filed a complaint in the Circuit Court of Dallas County against Blanks and the City, alleging violations of her Fourth Amendment rights through 42 U.S.C. § 1983. (*See* Doc. 1). Defendants removed the case to this Court on the basis of federal question jurisdiction. *Id.* In her First Amended Complaint, Tillis expanded her claims to include a claim against the City for failing to adequately train or supervise Blanks in his practice of executing warrants and failing to discipline Blanks for violating Tillis's constitutional rights; she also asserted two state law claims against Blanks and the City. (*See* Doc. 8). The Court exercises jurisdiction over the federal claims pursuant to 28 U.S.C. § 1441 and over the related state law claims through supplemental jurisdiction granted in 28 U.S.C. § 1367.

After the close of discovery, the parties submitted cross motions for summary judgment, along with the appropriate responses and replies thereto. Defendants seek summary judgment in their favor as to all four counts, and Plaintiff asks this Court to grant summary judgment as to her two § 1983 claims (Counts I–II). (*See* Docs. 13, 14).

3

The Court has reviewed the parties' submissions and the evidence submitted in favor of and against their respective positions and considers the following facts, viewed in a light most favorable to the non-moving party.

## A. The Burglaries in January 2014

On January 16, 2014, Mr. Eric Kelly of Selma, Alabama, reported his home had been burglarized. (Doc. 14-3). The Selma Police Department ("SPD") responded and prepared Uniform Incident/Offense Report number 2014–1472. *Id.* Mr. Kelly stated a 50-inch flat screen television was missing but did not provide any manufacturing information or a serial number. *Id.* SPD Lieutenant Curtis Muhannad assigned the case to Detective Ray S. Blanks,[1] a seven-year veteran of the SPD, on January 21, 2014; Blanks began investigating the case that same day. (Doc. 13-9, p. 1; Doc. 13-5).

On January 21, Blanks met with Mr. Kelly, his then-girlfriend Ms. Asheemeka Howard, and a witness to the crime, Ms. Temeka Morgan. (Doc. 13-9, p. 1). Ms. Howard indicated Mr. Sylvester Lewis[2] visited Mr. Kelly's house around 1:50 P.M., but it is unclear whether they engaged in any conversation. *Id.*; *see also* Doc. 14-5, pp. 25, 34–36. After Ms. Howard heard a knocking sound on Mr. Kelly's front door, she opened the door to see Lewis, who quickly left Mr. Kelly's property.

---

[1] Blanks first began working with the SPD in 1999 as a correctional officer. (Doc. 14-5, p. 14). He became a police officer with the SPD in March 2006, and at the time of the events relating to this matter, he worked as a detective in the major crimes unit. *Id.* at 15. Since joining the SPD as an officer, Blanks has attended four continuing education courses on search and seizure protocols. (Doc. 13-13, p. 1–3).
[2] Mr. Lewis is also known by the name Sylvester Stevenson. For consistency, the Court will identify him as "Lewis."

(Doc. 13-9, p. 1). In his meeting with Blanks, Mr. Kelly stated he was at work on the afternoon of the burglary when Lewis visited him and inquired about any job openings. *Id.* Mr. Kelly indicated the business was not hiring, and Lewis left around 2:20 P.M. *Id.* Mr. Kelly told Blanks Ms. Howard called him shortly after 2:20 P.M. to tell Mr. Kelly that Lewis had stopped by his home. *Id.* In her interview, Ms. Morgan told Blanks she was driving down Water Avenue, where Mr. Kelly's home is located, at approximately 2:30 P.M. on the afternoon of January 16, 2014 and observed an African-American male at Mr. Kelly's front door. *Id.*; *see also* Doc. 14-4, pp. 47–48. Ms. Morgan further stated she recognized the man as Lewis, and she later positively identified him from a "six pack photo lineup." (Doc. 13-9, p. 1).

Based upon this information, Blanks suspected Lewis was involved in the burglary of Mr. Kelly's home. (Doc. 13-9, p. 2). Blanks obtained an arrest warrant for Lewis on January 24, 2014 from Judge Joseph Hagood. *Id.* Blanks testified he followed routine practice in obtaining this arrest warrant, including having the District Attorney's office review the warrant. (*See* Doc. 14-5, p. 51).

A second burglary occurred on January 19, 2014 at the home of Mr. John Grayson. (Doc. 13-10). Mr. Grayson reported the incident to SPD, and officers were dispatched to his home and prepared Uniform Incident/Offense Report number 2014–1732. *Id.* Mr. Grayson stated the following items were missing from his home: (a) 33-inch flat screen television, possibly manufactured by Vizeo; (b) three [Dell] laptop computers; (c) one Compaq computer; (d) one Playstation 3 gaming console; (e) one 270-caliber rifle, possibly manufactured by Remington; and (f) one .22-

caliber rifle, possibly manufactured by Remington.[3] *Id.* at 1. The police were unable to find a point of entry, and Mr. Grayson suggested the burglar might have gained access by using the spare key. *Id.* at 2. The police collected no other evidence or information from the scene. *Id.* at 2–3. Blanks testified Mr. Grayson later told him he "had got knowledge that a white SUV was seen in his yard during the time of the burglary," and Blanks believed Lewis was involved due to the vehicle description.[4] (Doc. 14-5, p. 55).

During his investigation, Blanks learned Lewis lived with Tillis[5] at the residence she rented, located at 215 Lawrence Street, Selma, Alabama. (*See* Doc. 13-9, p. 1; Doc. 14-4, p. 1). The case report does not include details of how he obtained this knowledge. *Id.* Tillis owned a 2006 white Ford Explorer at the time and allowed Lewis to use the vehicle while she was at work. (*See* Doc. 13-11; Doc. 13-1, p. 8).

---

[3] Mr. Grayson updated the description of the items stolen from his home on the afternoon of February 6, 2014 after the search of Tillis's home. (*See* Doc. 13-10, p. 4). At that time, he provided more specific manufacturing information, including some serial numbers. The updated list is not included here, as this information was not available to Blanks at the time he made his search warrant affidavit or executed the warrant.

[4] Tillis has objected to Defendants' reliance on double hearsay as evidence establishing Lewis's connection to the Grayson robberies. (*See* Doc. 26, p. 7). The fact that a statement is hearsay will not, without more, preclude the Court's consideration of this evidence at the summary judgment stage. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (acknowledging "[s]ome courts, including our own, appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'") (internal citation omitted).

[5] Lewis and Tillis have been in a relationship since 2008, and the couple lived together "on and off" since 2009. (*See* Doc. 13-1, p. 4). The couple was unmarried at the time of the events in question but subsequently married on July 15, 2015. *Id.*

**B. Blanks's Search Warrant Affidavit and the Search Warrant**

After his investigation Blanks prepared a search warrant application and

affidavit to obtain a search warrant for the stolen items on February 6, 2014. (Doc.

13-9, p. 12). In his application and affidavit, he stated:

> On January 21, 2014, I, Detective Blanks, started investigating
> a burglary that occurred on January 16, 2014 at 3011 Water
> Avenue located in Selma, Alabama. A 50" flat screen television
> was taken during the burglary. During this investigation, I
> developed a suspect in this case who is identified as B/M
> Sylvester Lewis Jr. I further learned that Sylvester Lewis Jr.
> resides at 215 Lawrence Street in Selma, AL. At this time, I
> have an active warrant on Sylvester Lewis for Burglary 3rd
> Degree. At this time, I Detective Blanks is [sic] requesting
> permission to search for and seize any or all televisions,
> computers, laptops, tablets, and all or any electronics devices or
> stolen merchandise that is located at 215 Lawrence Street in
> Selma, Alabama.
>
> Affiant shows that based on the above and foregoing
> information, Affiant has probable cause to believe that, {Wanted
> Person {Sylvester Lewis Jr.}, and any or all televisions,
> computers, laptops, tablets and all or any electronics devices or
> stolen merchandise} is being, concealed, used and/or possessed
> upon the aforesaid premises/persons/vehicle. Due to the Affiant's
> experience with such locations/operations the following items
> may also be present: {Wanted Person {Sylvester Lewis Jr.}, and
> any or all televisions, computers, laptops, tablets and all or any
> electronics devices or stolen merchandise} and is subject to
> seizure and makes this Affidavit so that a warrant may be
> issued to search said premises/person/property.

(Doc. 14-6) (hereinafter the "Affidavit").[6] Before presenting the Affidavit to Judge

Hagood, Blanks submitted it to his superior officer Lt. Muhannad for review, as is

---

[6] Blanks testified he used a pre-drafted template, approved by the State, to prepare
his Affidavit. In this template, the officer writes a short narrative of the case in the
second paragraph and fills in the bracketed information in the final paragraph.
(Doc. 14-5, pp. 30–31).

customary practice in the SPD. (Doc. 14-5, p. 23; Doc. 14-9, p. 16). Because the District Attorney's office had previously reviewed Blanks's application and affidavit for Lewis's arrest warrant, he did not take it to that office for further review. (Doc. 14-5, p. 29). The City's corporate representative, Sergeant Evelyn Ghant[7] of the SPD, testified it is customary practice for the District Attorney's office to review applications for arrest and search warrants. (Doc. 14-9, pp. 16–17).

After receiving approval from Lt. Muhannad, Blanks presented the Affidavit before Judge Hagood. (Doc. 14-5, p. 23; Doc. 13-9, p. 1). Judge Hagood signed the Affidavit on February 6, 2014 at 9:33 A.M. (Affidavit). At that time, Judge Hagood issued a search warrant (the "Search Warrant") authorizing the search of Tillis's home, located at 215 Lawrence Street, for numerous items. (*See* Doc. 14-7). The Search Warrant authorized the search and seizure of the following:

> The residence at **{215 Lawrence Street, Selma, AL}** . . . The residence is to include any and all rooms, closets, drawers, cabinets and items that could be used to conceal illegal narcotics. Any illegal paraphernalia, weapons[,] any documents, all cell phones and electronic devises [sic] with the permission to download any or all media and photos that is needed for court purposes, or stolen merchandise.
> ***
> For the following: **{Wanted Person {Sylvester Lewis Jr.}, and any or all televisions, computers, laptops, tablets and all or any electronics devices or stolen merchandise}** and any and all other stolen merchandise.

(Search Warrant, Doc. 14-7) (emphasis in the original). Notably, the Search Warrant does not incorporate by reference any other document relating to Blanks's

---

[7] Sgt. Ghant first began working for the City in May 2002 as an officer with the SDP. She was actively employed on February 6, 2014 as a "sergeant, field supervisor, special victims unit" and was transitioning to the major crime unit.

investigation, including his Affidavit or the arrest warrant for Lewis. *Id.* After receiving the Search Warrant, Blanks and other members of the SPD proceeded to Tillis's residence, where they arrested Lewis and executed the Search Warrant. (Doc. 13-9, p. 2).

## C. Search of Tillis's Home

Blanks executed the Search Warrant at approximately 9:45 A.M. on February 6, 2014 for approximately thirty to forty minutes. (Doc. 13-9, p. 2; Doc. 14-5, p. 132). Tillis had been at work when the search began but unexpectedly came home early; when she arrived, she found members of the SPD, including Blanks, at her home. (Doc. 13-1, pp. 3, 5). In his case report summary, Blanks stated, "I also executed a search warrant at the residence [in] which all electronic devices were confiscated from the residence." (Doc. 13-9, p. 2). The Evidence Property Receipts indicate the following items were seized from Tillis's home:

1. black nylon bag containing De-Icer, Bengal fireant killer, bolt cutter, hammer, debit card with Christopher Grayson, coins, cologne, knife, and lotion
2. black nylon bag containing Xbox 360 s/n: 127920713305, notebook, box of .22 cal[iber] bullets, flashlight, black leather belt[,] blue belt, and chords
3. Insignia Television s/n: 217LE24MS76AH015859
4. JVC Television s/n: 067R0882[8]
5. Xbox 360 S/N: 314870594705
6. Panasonic Blue Ray DVD Player S/N: VA0LB003008
7. RCA Tablet without serial number
8. RCA Tablet s/n: TA161CL1A0256
9. RCA Tablet without serial number
10. RCA Tablet without serial number
11. HP destop [sic] monitor s/n: CND8082881
12. HP hard drive s/n: 2UA9451FMX

---

[8] This television is a 40-inch model. (Doc. 14-5, p. 93).

       13.    Verizon cellphone
       14.    Empty RCA Tablet boxes
       15.    Busted laptop w/ no serial number found in lot next to the
              residence
       16.    Red Child Four Wheeler

(*Compare* Doc. 14-8 *with* Doc. 13-7). The two evidence logs prepared by SPD

evidence technician(s) submitted into evidence at this time do not reflect the same

information. One evidence log omits the "red child four wheeler," and the other

omits the "busted laptop" which was found on the property adjacent to Tillis's home.

*Id.* Blanks indicates one form was given to Tillis at her home when SPD finished

the search and seizure and that the second report was given to him from Evidence

Tech as a part of the record of his investigation. (Doc. 14-5, p. 79).

      Tillis testified Blanks and the SPD removed all the electronics from her

home, including her personal cell phone, all televisions, her children's tablets, a

gaming console, a Blu Ray/DVD player, and their four-wheeler. (Doc. 13-1, p. 13–14;

Doc. 13-9, p. 4).[9] Blanks characterized the children's four-wheeler as an "electronic

device" because it "runs off spark plugs." (Doc. 14-5, p. 58). After further

investigation, Blanks determined only a nylon bag containing Mr. Grayson's debit

card was stolen property; none of the electronics seized from Tillis's home had been

reported stolen. *Id.* at 131.

      Blanks states he advised Tillis before leaving her residence, "any [seized]

---

[9] When deposing Lewis, Blanks and the City, through counsel, asked if Tillis's four children "were happy to get their stuff back," including their bicycles. (Doc. 13-9, p. 4). The evidence logs make no mention that the children's bicycles were seized from Tillis's home, but the Court notes this suggests further evidence of the City's questionable record-keeping practices in this case.

property that did not compare [to stolen property] would be released back to her."
(Doc. 14-5, p. 56). Tillis claims Blanks told her she would have to go to the police
station to determine what items had been seized from her home during the search.
(Doc. 13-1, pp. 5–6). She further alleges Blanks was "real ugly about the situation"
when she questioned him at her home. *Id.* at 8. The City's policy is to require proof
of ownership of seized property before it will be released back to the claiming party.
(Doc. 14-5, p. 95). Tillis states Blanks told her several times she would be able to
retrieve her items if she brought documents establishing ownership. (Doc. 13-1, p.
8).

During his deposition, Blanks recounted his reasoning for believing Lewis
had committed the Kelly burglary (*see* Doc. 14-5, p. 45). He further admitted he
made a "mistake" by leaving out any information relating to the Grayson burglary
in his Affidavit but affirmatively asserted that he considered the Grayson burglary
when he was preparing the Affidavit and the Search Warrant. *Id.* at 55, 75. Blanks
further stated, "my probable cause and the search warrant [for Tillis's home] are
pretty much referenced from the information from the affidavit for the arrest." *Id.*
at 28, 41–42. Blanks stated he "had a reasonable suspicion" that Lewis had
committed the burglaries and revealed "the probable cause was developed by the
DA's [District Attorney's] office."[10] *Id.* at 41. Further, Blanks conceded his Affidavit

---

[10] At another point in his deposition, Blanks stated, "the probable cause from my
understanding is developed by the judge." (Doc. 14-5, p. 31–32). He further stated
the Affidavit was "based off the facts of the case." *Id.* at 32. When asked whether he
personally developed probable cause in his Affidavit, he replied, "I don't take cases
personal. I just go by the facts and the letter of the law." *Id.*

lacked any information to support a finding of probable cause for illegal narcotics,

illegal paraphernalia, and weapons. *Id.* at 59, 61.

    During his deposition, Blanks also discussed how he determined which items

to seize in the home:

> Q. So it doesn't matter whether or not it is legally owned or
> stolen. You're going to take them all?
> A. The search warrant indicated all electronic devices.
> Q. Would you take all electronic devices and then search to
> determine if they were stolen later?
> A. That was the purpose that we took them, to see what they
> stole to compare to the other cases that were being worked
> against Sylvester Lewis. . . .
> Q. So you took them just to see if they were stolen ahead of
> time? You didn't know that they were stolen ahead of time?
> A. No.
> * * *
> Q. So you conducted that search [of Tillis's home], and you
> seized those items to see if any of those were evidence in a
> crime?
> A. Yes. And that was explained to [Tillis] and told her that she
> could get the property back once she bring proper receipts.
> ***
> Q. I'm just saying if you—a police officer didn't want to go in
> there and just seize anything and everything and figure it out
> later whether or not it was stolen, he just wanted to go and take
> the things that you [Blanks] were interested in looking for, the
> specific things, they couldn't do that with the language of this
> search warrant, could they?
> A. No.
> Q. So the only thing they could do with this search warrant is
> take it all and figure it out later?
> A. Yes. And that was the purpose of the search warrant.

(Doc. 14-5, p. 71–72, 74–75). Blanks further admitted he had no knowledge of any

reports of a stolen red, children's four-wheeler prior to seizing the one at Tillis's

home. *Id.* at 82. In general, Blanks testified that he seized all electronics in Tillis's

home, regardless of whether he knew they were stolen, in order to check the serial

numbers to determine whether the seized items are evidence of crimes. *Id.* at 114. He stated he had reasonable suspicion when searching the home to seize electronic items that had missing or damaged serial numbers, such as the four-wheeler and some of the tablets.[11] *Id.* at 88–89, 113–15.  According to Sgt. Ghant, officers conducting a search warrant have the ability to call in a serial number from the field to determine whether the item has been reported stolen. (Doc. 13-9, p. 22). If a serial number has been tampered with in any way, it is customary practice to confiscate the item until the owner can produce documentation or proof of ownership. *Id.* During his search of the Tillis residence, Blanks confiscated all electronics, even those with a serial number on them, rather than calling in the numbers from the field. (*See generally* Doc. 14-5, pp. 71–75).

## D. The Aftermath of the Search

After the SPD concluded the search of her residence, Tillis collected evidence of proof of ownership of different items that had been seized and visited the police station in Selma. (Doc. 13-1, p. 8). Tillis states she attempted to show proof of ownership of certain items, such as the four tablets and the bicycles, when she arrived at the police station on February 6. *Id.* She indicates the SPD[12] refused to accept her proof of ownership at that time and directed her to Lt. Muhannad. *Id.* Tillis claims she went back to the police station on February 7, again with proof of

---

[11] According to Tillis, while at her home executing the Search Warrant, Blanks told her, "it was might suspicious to come into a house in which there's four tablets." (Doc. 13-1, p. 6). Tillis states she told Blanks at that time, "that's not suspicious. I have four babies in the house. I have four bicycles over in the corner." *Id.*
[12] Tillis does not identify to whom she spoke at the SPD. (Doc. 13-1, p. 8).

ownership, to recover the items that had been seized. *Id.* According to Tillis, Lt. Muhannad advised her that her attorney would have to work with the SPD to receive her items and that he would not release anything back to her individually. *Id.*; *see also* p. 13. Blanks maintains Tillis never came to see him to claim any of the items and insists they would have been returned to her if she had followed his instructions. (Doc. 14-5, pp. 72–73).

Subsequently to Tillis's visits to the SPD, her vehicle was destroyed in an act of arson. (*See* Doc. 13-11). Lewis and Tillis reported the crime to SPD on May 20, 2014, and the SPD prepared an incident report numbered 2014–14130. *Id.* Tillis claims all of her receipts and evidence of ownership for the items taken during the search were still in her vehicle at the time it was destroyed. (Doc. 13-1, pp. 9, 12). After the original documentation was burned, Tillis did not obtain duplicates or other proofs of ownership.[13] *Id.* at 10.

The City, through the District Attorney's office, eventually returned almost all the items taken in the search of Tillis's home. (Doc. 14-9, p. 64). This official action, however, did not occur until about two years had passed. (Doc. 13-10, p. 2) (exact date not specified). Lewis testified he did not receive the black nylon bags or the bolt cutters back; moreover, he indicated the children's red four-wheeler was damaged and would not start. (Doc. 13-12, p. 4).

Tillis claims to have suffered humiliation, emotional distress, and mental

---

[13] Tillis initially reached out to Jerry Hatfield, the owner of the store from which she purchased the red four-wheeler. In deposition, Mr. Hatfield admitted she had requested a copy of her receipt but does not recall ever providing her with one. (Doc. 13-14, p. 2).

anguish as a result of having to replace her children's toys and other lawfully owned electronics after they were seized from her home. (Doc. 14-10, pp. 1–2). She further suffered distress and anguish "in worrying how this experience may effect" her children, who were particularly upset that their Christmas gifts were taken by the SPD. *Id.* at 2. She further claims some of items were not returned to her in their original working condition and that she suffered monetary loss and other monetary damages; the four-wheeler, for example, requires approximately $230 of repairs. *Id.* at 2–3.

**E. The City of Selma's Customary Practices, Policies, and Procedures**

Both Blanks and Sgt. Ghant testified as to the City's customary practices and procedures regarding different aspects of searches and seizures governed by the Fourth Amendment. Officers typically prepare affidavits and applications for warrants using a template (Doc. 14-9, p. 12). Sgt. Ghant testified officers are trained to prepare the affidavits and applications on the basis that probable cause exists for the warrant to issue. *Id.* at 15. Generally, the officer will prepare the affidavit and application, as well as the warrant, based on his or her investigation of the case. *Id.* at 16. The officer's supervisor will "normally read over it" to "look for errors" and to ensure the warrant is supported by probable cause. *Id.* at 16, 19. The District Attorney's office generally reviews the drafted warrant and the supporting affidavit before the officer appears before the judge. *Id.* at 16–17.

Stg. Ghant attested to the broad language used in the Affidavit and Search Warrant authorizing search and seizure of "any or all televisions, computers,

laptops, tablets and all or any electronics devises or stolen merchandise" would routinely be approved by an officer's superior. *Id.* at 20, 29–30, 47, 72–73. In her deposition, Sgt. Ghant affirmed it is the "customary practice of the City of Selma to approve search warrants with these general-type descriptions." *Id.* at 72. She further affirmed the City has "the custom or usage . . . to approve search warrants for items that are not identified in the application for [the] search warrant." *Id.* at 50. Moreover, Sgt. Ghant indicated it is common practice or customary "to confiscate items to further investigate just to check to see if it's stolen or not." *Id.* at 82; *see also* p. 21. She further affirmed "it is the policy of the City of Selma to seize those items regardless of whether they know it was stolen or not in order to make an investigation to find out of it was stolen or not." *Id.* at 23 (referring to items seized when a party lacks documentation that the item belongs to them).

In her capacity as the corporate representative, Sgt. Ghant also reviewed the City's customary practice or policy relating to the return of items seized during the execution of a search warrant.  Sgt. Ghant indicated the City requires proof of ownership before any items seized can be returned to the claimant. (Doc. 14-9, p. 97). For some items, however, she acknowledged proof of ownership is impossible to obtain; for instance, some electronics are bought second-hand without receipts or other formal documentation. *See id.* at 23. When a party cannot produce formal documentation regarding proof of ownership, then SPD officers

> run [the item description or, if available, the serial number]
> through [the system]—look at other reports to make sure that
> it's not being reported through any other reports . . . . Then if . . .
> we can prove that it [does not] belong to [anyone] else, we will

16

have to give the property back to the individual.

*Id.* at 23.

In her review of the Affidavit during her deposition, Sgt. Ghant stated she most likely would have approved the Affidavit if she had been the reviewing supervisor. (Doc. 14-9, p. 37, 46). Despite her assessment that the Affidavit provides enough probable cause to issue a search warrant, she concedes, "you [i.e. a reasonable officer] can't tell" from the Search Warrant or Affidavit which property to seize because it does not clearly identify which electronics have been stolen or otherwise separate which might be lawfully possessed by the homeowner. *Id.* at 51. In his own deposition, Blanks admitted a reasonable officer would not be able to "differentiate the stolen televisions [Blanks was] looking for from a TV that somebody lawfully owned" because the Search Warrant did not provide any details about the stolen merchandise. (*See* Doc. 14-5, pp. 74–75).

## III. Analysis of Tillis's Federal Law Claims

In her First Amended Complaint, Tillis asserts two § 1983 claims against Blanks in his individual capacity (Count I) and against the City (Count II).

## A. § 1983 Claim against Detective Blanks

Tillis asserts Blanks infringed upon her Fourth Amendment[14] rights in violation of 42 U.S.C. § 1983, which states:

---

[14] In her First Amended Complaint, Tillis alleges Blanks had violated her Fourth Amendment rights as well as her Fourteenth Amendment due process rights. (*See* Doc. 8, ¶ 21). Tillis abandoned this claim in her response to Defendants' motion for summary judgment and proceeds only under the theory that Blanks violated her Fourth Amendment rights. (*See* Doc. 26, p.17).

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and its laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Blanks claims he did not violate Tillis's Fourth Amendment rights and seeks

qualified immunity. "The doctrine of qualified immunity protects government

officials 'from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person

would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mercado v. City of Orlando*, 407

F.3d 1152, 1156 (11th Cir. 2005). "Qualified immunity allows government

employees to carry out their discretionary duties without fear of litigation,

'protecting from suit all but the plainly incompetent or one who is knowingly

violating federal law.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.

2002)). "'Qualified immunity balances two important interests—the need to hold

public officials accountable when they exercise power irresponsibly and the need to

shield officials from harassment, distraction, and liability when they perform their

duties reasonably.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting

*Pearson*, 555 U.S. at 231). Relevant here, qualified immunity protects officials from

suit, not just from litigation; thus, if the claim against Defendants can be resolved

at the summary judgment phase, the Court must appropriately do so. *See Pearson*,

555 U.S. at 231–32; *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (internal quotation marks omitted). Courts consider "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were in his power to utilize." *Holloman ex rel. Hollman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, it is clear Blanks was acting within the scope of his discretionary authority, and the parties agree on this point. *See Signature Pharmacy, Inc. v. Wright*, 438 Fed. App'x 741, 744 (11th Cir. 2011). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.[15]

Under *Saucier v. Katz*, 533 U.S. 194 (2001), the "threshold question" to be determined before any other inquiry is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. Only if the answer to that question is affirmative may the Court proceed to determine "whether the right was clearly

---

[15] "Courts utilize a two-part framework to evaluate qualified immunity claims. One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. If the facts, construed as they must be in this summary judgment appeal in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.' Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (internal citations omitted).

established . . . in light of the specific context of the case, not as a broad general proposition." *Id.*; *see also Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established"). The Court notes that this two-part inquiry established in *Saucier* is no longer mandatory. *Pearson*, 555 U.S. 223. If no constitutional right was violated, the court need not inquire further. *Id.*  If, however, a constitutional violation occurred, the Court must then determine whether the right was clearly established. *Id.*

### 1. Did Detective Blanks violate Tillis's clearly established constitutional rights?

In considering the first step of *Saucier*'s two-step qualified immunity inquiry, the Court must determine whether the plaintiff's constitutional right to be free from unreasonable searches and seizures was violated. The Court, in making this determination, must presume that the plaintiff's version of events is true. *See Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (The threshold inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation.") (emphasis added). In "rare circumstances," the Court may also look to see if "the conduct was so obviously prohibited by the Fourth Amendment that the constitutional violation would be readily apparent to the officer with 'obvious clarity.'" *Wate v. Kubler*, 839 F.3d 1012, 1018, (11th Cir. 2016) (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1291–92 (11th Cir. 2011)). The Eleventh Circuit recently outlined the proper framework:

> To determine whether a right was clearly established, we

> look to binding decisions of the Supreme Court of the
> United States, the United States Court of Appeals for the
> Eleventh Circuit, and the highest court of the pertinent
> states, here the [Alabama] Supreme Court. *See McClish v.*
> *Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). Based on
> these decisions, we ask "'whether it would be clear to a
> reasonable officer that his conduct was unlawful in the
> situation confronted.'" *Terrell v. Smith*, 668 F.3d 1244,
> 1255 (11th Cir. 2012) (quoting *Saucier*, 553 U.S. at 202).

*Id.* at 1018.

Tillis argues Blanks violated her Fourth Amendment rights by executing an invalid search warrant lacking in probable cause and by conducting a general search in violation of the Fourth Amendment's particularity requirement. (*See* Doc. 16, pp. 4, 9). The Fourth Amendment of the United States Constitution provides,

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and seizures,
> shall not be violated, and no warrants shall issue, but upon
> probable cause, supported by oath or affirmation, and
> particularly describing the place to be searched, and the persons
> or things to be seized.

U.S. CONST. amend. IV. In general, a search warrant must: (1) be based upon probable cause; (2) be supported by a sworn affidavit; (3) particularly describe the place to be searched; and (4) particularly describe the items to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Court turns first to Tillis's argument that the search warrant in question failed to establish probable cause.

### a. Lack of Probable Cause

Probable cause to support a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Brundidge*, 170

F.3d 1350, 1352 (11th Cir. 1999). The Court considers the totality of the circumstances when determining the existence of probable cause. *Brundidge*, 170 F.3d at 1352. Indeed, "[p]robable cause for a search warrant is a fluid concept, turning on the assessment of probabilities in particular factual contexts." *Id.* "The focus in a warrant application is usually on whether a suspect committed a crime and whether evidence of the crime is to be found [at the place to be searched]. . . . Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1315 (11th Cir. 2002). As the Eleventh Circuit has noted, the affiant "'must reveal facts that make it likely that the items sought are in that place when the warrant issues,'" and the probable cause supporting the affidavit and application for the search warrant "must exist when the magistrate judge issues" it. *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (quoting *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985)). The Court must determine "whether a reasonably well-trained officer in [Blanks's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. 335, 345 (1986). To determine whether Blanks's actions were objectively reasonable, the Court looks to the information known to him, viewed in a light most favorable to Tillis. *See Harris v. Coweta County*, 21 F.3d 388, 390 (11th Cir. 1994).

In his Affidavit, Blanks laid out a short narrative of facts purporting to establish probable cause for the search of Lewis's (and thus Tillis's) home. Blanks

stated few facts, which are summarized as follows: he was investigating a single burglary in which one 50-inch television was stolen; he "developed a suspect," Lewis, and learned Lewis lived at 215 Lawrence Street; and Blanks had an active arrest warrant for Lewis for burglary. (*See* Doc. 14-6). Moreover, in the Affidavit, Blanks sought permission to obtain a search warrant for "**any or all** televisions, computers, laptops, tablets and **all or any** electronics devices or stolen merchandise" at Tillis's address. *Id.* (emphasis added). At most, the Court can conclude Blanks had probable cause to search only for a single 50-inch television. All of the facts, sparse as they might be, contained in the Affidavit relate to the Kelly burglary on January 16. It is well established that Mr. Kelly only reported the theft of a 50-inch television. (*See* Doc. 14-5, pp. 53–54).

Defendants argue the Court must also consider Blanks's knowledge at the time he executed the warrant, even if that knowledge was not reflected in the warrant or the supporting affidavit. In so arguing, they rely on the Eleventh Circuit's non-binding decision in *Signature Pharmacy, Inc. v. Wright*, 438 Fed. App'x 741 (11th Cir. 2011). The Court is not persuaded by Defendants' interpretation of *Signature Pharmacy* or *United States v. Burke*, 784 F.2d 1090 (11th Cir. 1986), which is cited as supporting the proposition. In both cases, the Eleventh Circuit looked to the executing officer's knowledge of the *premises* to be searched when the warrant did not adequately specify or describe the sub-unit of the place to be searched. *See Signature Pharmacy*, 438 Fed. App'x at 744; *Burke*, 784 F.2d at 1092–93. The parties have not cited to case law requiring courts to

consider an officer's knowledge of *other crimes* committed when analyzing an insufficient affidavit or search warrant. In fact, case law in this Circuit flatly contradicts this notion. It is uncontroverted that warrants may cross-reference other documents, so long as "the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004). In this case, however, Blanks did not cross-reference any other documents he prepared in his investigation of Lewis and the Kelly and Grayson burglaries. Even though he later claimed, "my probable cause and the search warrant are pretty much referenced from the information from the affidavit for the arrest [warrant]," the Court cannot consider this because he failed to incorporate these documents into the Search Warrant. *See Groh*, 540 U.S. at 558. As the Supreme Court in *Groh* found, "[t]his warrant did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items. Nor did it make what fairly could be characterized as a mere technical mistake or a typographical error." *Id*. Similarly, this Court cannot find Blanks's apparent "mistake" in forgetting to include any reference whatsoever to a second crime in his Affidavit as a "technical mistake" or other error. He failed to detail any facts connecting Lewis to the theft of anything other than a 50-inch television and cannot point to a single fact that indicates, with any degree of probability, a connection between the residence and the criminal activity. Moreover, Blanks flatly admitted his Affidavit failed to indicate any facts establishing probable cause to search for illegal narcotics, illegal paraphernalia, or weapons. (*See* Doc. 14-5, pp. 59, 61). At

minimum, Blanks should have known he should not have applied for the Search

Warrant including a search for narcotics, related paraphernalia, and weapons. *See*

*Malley*, 475 U.S. at 345.

In their next defense of the Affidavit and Search Warrant, Defendants point

to Judge Hagood's finding of probable cause by issuing the Search Warrant. In

*Messerschmidt v. Millender*, the Supreme Court indicated the fact that a neutral

magistrate issued the warrant does not, without further inquiry, guarantee the

search and seizure was objectively reasonable or executed in "objective good faith."

*Messerschmidt v. Millender*, – U.S. –, 132 S.Ct. 1235, 1245 (2012). Chief Justice

Roberts stated,

> the fact that a neutral magistrate has issued a warrant
> authorizing the allegedly unconstitutional search or seizure does
> not end the inquiry into objective reasonableness. Rather, we
> have recognized an exception allowing suit when "it is so obvious
> that no reasonably competent officer would have concluded that
> a warrant should issue." *Malley*, 475 U.S. at 341. The "shield of
> immunity" otherwise conferred by the warrant, *id.*, at 345, will
> be lost, for example, where the warrant was "based on an
> affidavit so lacking in indicia of probable cause as to render
> official belief in its existence entirely unreasonable." *United
> States v. Leon*, 468 U.S. 897, 923 (1984) (internal quotation
> marks omitted).

*Id.* The Supreme Court noted plaintiffs face a "high" threshold for establishing this

exception, *id.*, and Defendants argue it does not apply in this case. While

*Messerschmidt* presents a properly narrow exception, the Court finds it does apply

in this case. Blanks's affidavit is "so lacking in indicia of probable cause" to the

point that "belief in its existence [is] entirely unreasonable." *Id.* As stated above,

Blanks utterly failed to include any facts about the Grayson burglary, in which

25

multiple electronics were stolen. He further failed to incorporate by reference any documents providing a more thorough explanation of the facts connecting (1) Lewis to the thefts of more than a 50-inch television and (2) the presence of stolen merchandise at Tillis's home. Blanks's request to search for "**all or any** electronics devices or stolen merchandise" is not supported by probable cause in his Affidavit, and the issued Search Warrant was obviously defective. Despite review from Lt. Muhannad and the issuing court, this Court finds that "no officer of reasonable competence would have requested the warrant" on the limited facts set forth. *See Malley*, 475 U.S. at 346; *Messerschmidt*, 132 S.Ct. at 1249. The Court, however, recognizes the Affidavit provided enough probable cause to authorize the search for the 50-inch television stolen in the Kelly burglary. As such, the Court cannot find Blanks to be considered "plainly incompetent" for concluding the Search Warrant issued properly. *See Messerschmidt*, 132 S.Ct. at 1250.

As such, the Court turns to Tillis's second argument that the Search Warrant failed to meet the specificity requirement and as such issued as a general warrant.

### b. The Particularity Requirement and the Prohibition of General Warrants

The Fourth Amendment requires that every warrant particularly describe two things: "the place to be searched" and the "persons or things to be seized." U.S. CONST. amend. IV. As many Courts and scholars have noted, the unjust, unfettered access to a citizen's private home allowed by general warrants was at the forefront of the Founders' minds when drafting the Fourth Amendment. *See generally United States v. Phillips*, 834 F.3d 1176, 1180 (11th Cir. 2016); *see also* Laura K. Donohue,

*The Original Fourth Amendment*, 83 U. CHI. L. REV. 1181 (2016). "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh*, 540 U.S. at 556; *see also Leon*, 468 U.S. at 922 ("Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched *or the things to be seized*—that the executing officers cannot reasonably presume it to be valid.") (emphasis added). Having settled the particularity requirement was "clearly established" long before February 6, 2014, the Court now considers whether the Search Warrant issued and executed complied with it.

First, a warrant must describe the things to be seized with sufficient particularity so that the precise language informs officers how to separate properly seized items from irrelevant items. *Marron v. United States,* 275 U.S. 192, 196 (1927). However, "elaborate specificity is unnecessary." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984). "The description is considered sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *Id.* at 754–55 (citation and internal quotation marks omitted). This requirement does not necessitate technical perfection; instead, it is applied with "a practical margin of flexibility." *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982)). "If the applicant for the warrant cannot give an exact description, but has probable cause to believe that such materials exist, the warrant

is sufficiently particular if it is as specific as the circumstances and nature of the activity under investigation permit." *United States v. Collins*, 1:14-CR-302-TWT-AJB, 2016 WL 1639960, *16 (N.D. Ga. Feb. 9, 2016) (citing *United States v. Roussea*, 628 Fed. App'x 1022, 1025–26 (11th Cir. 2015)). To avoid overbreadth and thus violation of the Fourth Amendment, the warrant must "limit[] the seizure of items to only those items that constitute evidence of a criminal activity." *Id.* Second, the description of the things to be seized should be limited to the scope of probable cause established in the warrant. Together, these elements forbid agents from obtaining general warrants. A general order to search through a person's belongings is not permissible under the Fourth Amendment. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (A warrant is impermissibly overbroad if it authorizes "a general, exploratory rummaging in a person's belongings.") Instead, a warrant requires agents to conduct narrow seizures that attempt to "minimize[] unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976). Thus, "the test is whether the search was a general exploration or specifically directed to the means and instrumentalities by which the crime charged had been committed." *Collins*, 2016 WL 1639960 at *16 (citing *Harris v. United States*, 331 U.S. 145, 153–54 (1947)).

Tillis argues Blanks engaged in a "general rummaging" of her lawfully possessed property and that he engaged in a general, exploratory search. The Defendants counter that Blanks could not have been more specific in his descriptions because the exact details of the stolen property in both cases were

28

unknown; they further argue the descriptions enabled the searchers to reasonably ascertain and identify the items to be seized. Defendants again rely on *Signature Pharmacy*. In *Signature Pharmacy*, the search warrant in question authorized seizure of numerous items, including "documents, records, bills, logs, computer equipment, and so forth, **which [are] evidence of a criminal violation of the laws of the State of Florida.**" *Signature Pharmacy*, 438 Fed. App'x at 745–46 (emphasis in the original). The Eleventh Circuit determined this broad wording described items with "sufficient particularity" in light of the officer's ability and the nature of the crime itself. To support this, the Eleventh Circuit looked at its earlier decision in *United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985). In *Santarelli*, the warrant provided a catch-all phrase, authorizing the seizure of "all property constituting evidence of the crimes of making and conspiring to make extortionate extensions of credit, financing extortionate extensions of credit, and collections of and conspiracy to collect extortionate extensions of credit which are being kept there in violation of Title 18, United States Code, §§ 892, 893 and 894." *Santarelli*, 778 F.2d at 613–14. The Eleventh Circuit upheld that warrant, stating, the "general description sufficed because the exact identity of the evidence to be seized could not have been known at the time the warrant issued and because the warrant limited the search to evidence of [the relevant crime(s)]." *Id.* at 615.

Notably, however, *Santarelli*, like *Signature Pharmacy* and the cases on which it relies, all relate to white-collar crimes, such as loansharking. *See id.* In this case, however, Blanks was investigating—at most—two burglaries in which specific

29

items were stolen. He knew Mr. Kelly was missing a 50-inch television. (*See* Doc.
13-4). He further knew Mr. Grayson had reported specific items, such as a
Playstation 3 gaming station, three Dell laptops, one Compaq computer, and a 33-
inch television. (*See* Doc. 13-10, p. 1). While the generic term "electronics" does, in
fact, relate to the items stolen from these two homes, they do not allow reasonable
officers to determine, with any specificity, which electronics in the modern-day
American home are lawfully possessed or stolen property. As Blanks noted in his
deposition, it is not illegal to own any of these items. (Doc. 14-5, p. 57). Further, he
admitted a reasonable officer would be unable to ascertain and identify the items to
be seized based on the language in the Search Warrant. *Id.* at 74–75. Sgt. Ghant
similarly admitted she, or a reasonable office, would not be able to isolate the stolen
property (if any) found in Tillis's home from the lawfully possessed property based
on the language describing the items to be seized in the Search Warrant. (*See* Doc.
14-9, p. 51). The fact that Blanks seized two 40-inch televisions and two Xbox
gaming consoles from Tillis's home indicates the Search Warrant failed to describe
the items with sufficient particularity. (*See* Doc. 14-5, pp. 70, 73, 76, 97). If the
officer who drafted the warrant cannot know exactly what he is looking for, how can
the reasonable officer relying on the warrant separate the items to be seized from
the items to be left?

While "catch-all" provisions, such as the "all and any" language included in
the Search Warrant, have been allowed by prior Eleventh Circuit decisions, the
language in this Search Warrant cannot stand. Unlike the warrants that have been

upheld, this Search Warrant authorized search and seizure of "**any or all
televisions, computers, laptops, tablets, and all or any electronic devices or
stolen merchandise**." (Doc. 14-7) (emphasis in the original). The sweeping
language found here does not point to any specific criminal activity or enterprise,
*see Signature Pharmacy*, 438 Fed. App'x at 745–46, much less the two specific
crimes of which Lewis was accused, and it also encompasses legally owned items
which are commonly found in households across this jurisdiction.

Furthermore, the Court finds Blanks's explanations as to why he felt the
need to confiscate **all** the electronics in Tillis's home particularly perplexing. In his
deposition, he stated the purpose of the search was "to see what they stole to
compare to the other cases that were being worked against Sylvester Lewis." (Doc.
14-5, p. 72). Blanks's testimony evidences an alarming lack of concern as to whether
the items he seized were legally owned or stolen:

> Q. So it doesn't matter whether or not it is legally owned or
> stolen. You're going to take them all?
> A. The search warrant indicated all electronic devices.
> Q. Would you take all electronic devices and then search to
> determine if they were stolen later?
> A. That was the purpose that we took them, to see what they
> stole to compare to the other cases that were being worked
> against Sylvester Lewis. . . .
> Q. So you took them just to see if they were stolen ahead of
> time? You didn't know that they were stolen ahead of time?
> A. No.
> * * *
> Q. So you conducted that search [of Tillis's home], and you
> seized those items to see if any of those were evidence in a
> crime?
> A. Yes.

*Id.* at 71–72. This dialogue indicates the Search Warrant authorized, in the mind of

31

Blanks, a general, exploratory search through Tillis's and Lewis's personal

possessions. Further, it indicates Blanks failed to execute the Search Warrant in

good faith, as is required by the law of this Circuit. The Eleventh Circuit has stated,

> [t]he search must be one directed in good faith towards the
> objects specified in the warrant or for other means and
> instrumentalities by which the crime charged has been
> committed. It must not be a general exploratory search through
> which the officers merely hope to discover evidence of
> wrongdoing.

*Gurleski v. United States*, 405 F.2d 253, 258 (11th Cir. 1968). While the good-faith

exception applies to general and overbroad search warrants, *see Collins*, 2016 WL

1639960 at *18, the Court cannot find the exception applies here to certain items

seized. The Court considers items described in the Search Warrant, the Affidavit,

and the victims' reports, *see id.*, and holds that Blanks seized numerous items

without probable cause. The Court holds the Search Warrant failed to particularize

the things to be seized to such an extent that it was facially deficient; as such,

Blanks could not—or should not—have presumed it was a valid warrant. *See Leon*,

468 U.S. at 922. Moreover, the Court finds Blanks engaged in a "general exploratory

search" of the electronics in Tillis's home in the hope of "discover[ing] evidence of

wrongdoing." *See Gurleski*, 405 F.2d at 258. As such, the Court finds Blanks

violated Tillis's Fourth Amendment right is not entitled to qualified immunity as to

Tillis's § 1983 claim (Count I).

    For these reasons, the Court **GRANTS** Tillis's motion for summary judgment

as to Count I of her First Amended Complaint and **DENIES** Defendants' motion for

summary judgment as to Count I.  Having so determined, the Court turns its

attention to Tillis's federal claim against the City.

## B. § 1983 Claim against City of Selma

Local governments may not be held liable for their employees' torts on a *respondeat superior* basis but may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Sometimes, municipal liability may be premised not on an affirmative or express policy or decision, but rather the absence of or refusal to adopt a municipal policy of decision to prevent known and likely constitutional violations. In these "inadequate policy" cases, such as a failure-to-train claim, for example, "the inadequacy . . . may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989) (emphasis added). "The 'deliberate indifference' standard . . . does not turn upon the degree of fault (if any) that a plaintiff must show to make out [the] underlying clam on a constitutional violation." *Id.* at 388 n. 8. Instead, "[i]f a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for," and their "continued adherence to an approach that they knew or should know has failed to prevent tortious conduct by employees may establish the . . . 'deliberate indifference' . . . necessary to trigger municipal liability." *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (citations omitted). Such circumstances, however,

are limited, and the degree of causation required is strict, for fear of sliding towards a mere "but for" requirement and thus collapsing municipal liability into *respondeat superior* liability where, for example, the plaintiff would have suffered no injury had the offending employee not been hired. *Id.* at 410; *Canton*, 489 U.S. at 391–92 ("In virtually every instance where a person had had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."). "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)). Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Bd. of the Cnty. Commr's of Bryan Cnty. Okla. v. Brown*, 520 U.S. 397, 409 (1997))).

Therefore, if a municipality has no notice of the need to train or supervise in a particular area, it cannot be liable as a matter of law for any failure to train or supervise. *Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990) (holding sheriff's department not liable for deputy's acts when no evidence of a history of widespread prior abuse put the sheriff on notice of the need for improved training or supervision); *Popham v. City of Talladega*, 908 F.2d 1561 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put city on notice of a

need to train). Tillis has not produced any specific examples of other cases in which Blanks has violated others' Fourth Amendment rights by executing a warrant without indicia of probable cause or by conducting a general, exploratory search. She has, however, uncovered an alarming tendency within the SPD to approve warrant affidavits and applications utilizing broad language or to approve search warrants for items not identified in the applications. (*See* Doc. 13-9, pp. 20, 29–30, 47, 50, 72–73). Indeed, Sgt. Ghant's testimony, along with Blanks's testimony and actions, reveals a perplexing disregard for the meaning of the Fourth Amendment. Both Sgt. Ghant and Blanks noted it was customary practice or procedure to seize any items without proper documentation, regardless of whether they have been reported in connection to any crime, just to "investigate" whether the item is stolen. (*See* Docs. 14-9, pp. 21, 23; 14-5, p. 71–75). Moreover, no supervisor or other City official has ever advised Blanks his search warrant and affidavit language is overbroad or otherwise fails to meet the requirements of the Fourth Amendment. (Doc. 14-5, p. 117). In her deposition, Sgt. Ghant acknowledged she would approve a search warrant and affidavit similar to the ones prepared by Blanks in this case. (Doc. 14-9, pp. 30, 72–74).

Although these instances are not specific to any one, identifiable case, it is clear to this Court that the City has inadequately trained and supervised Blanks, among others, in aspects of the Fourth Amendment as related to searches and seizures. His officer profile report indicates Blanks has only received four continuing education courses relating to searches and seizures since his

employment began in March 2006.[16] (*See* Doc. 13-13). The Court, however, as a matter of law cannot find that the City had actual or constructive notice of this inadequate training. Simply "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing accident" is an insufficient standard to hold the City liable. *See Canton*, 489 U.S. at 391; *see also Toth v. City of Dothan, Ala.*, 953 F. Supp. 1502, 1512 (M.D. Ala. 1996). Tillis has failed to demonstrate the City's abysmal training programs rise to the level of "deliberate indifference." As such, Defendants' motion for summary judgment as to Count II must be **GRANTED**, and Plaintiff's motion for summary judgment as to Count II must be **DENIED**.

## IV. Analysis of Tillis's State Law Claims

In addition to her federal claims under 42 U.S.C. § 1983, Tillis alleges two state law claims (Counts III and IV). Count III is brought against Blanks is his individual capacity, and Count IV is brought against the City of Selma.

## A. State Law Negligence Claim against Detective Blanks

In Count III, Tillis alleges Blanks "negligently, carelessly, or unskillfully" prepared the search warrant affidavit, conducted a general rummaging search of her lawfully owned possessions, and seized items not identified in the search warrant in violation of the Fourth Amendment. (*See* Doc. 8, ¶¶ 30–37). Just as Blanks invoked qualified immunity for the § 1983 claim against he, he has invoked state agent and/or discretionary function immunity for the Alabama state law

---

[16] Sgt. Ghant indicated SPD officers receive annual training and updates relating to the Fourth Amendment. (Doc. 14-9, p. 15).

claims pursuant to Alabama Code § 6–5–338. The Alabama Legislature enacted this

provision in 1994, which provides:

> Every peace officer . . . who is employed or appointed pursuant
> to the Constitution or statutes of this state . . . and whose duties
> prescribed by law, or by the lawful terms of their employment or
> appointment, include the enforcement of, or the investigation
> and reporting of violations of, the criminal laws of this state, and
> who is empowered by the laws of this state to execute warrants,
> to arrest, and to take into custody persons who violate, or what
> are lawfully charged by warrant, indictment, or other lawful
> process, with violations of, the criminal laws of this state, shall
> at all times be deemed to be officers of this state, and as such
> shall have immunity from tort liability arising out of his or her
> conduct in performance of any discretionary function within the
> line and scope of his or her law enforcement duties.

Ala. Code § 6–5–338(a) (1975). In *Ex parte Cranman*, the Supreme Court of

Alabama "restate[d] the rule governing State-agent immunity":

> A State agent *shall* be immune from civil liability in his or her
> personal capacity when the conduct made the basis of the claim
> against the agent is based upon the agent
>
> ***
> (2) exercising his or her judgment in the administration of a
> department or agency, including, but not limited to, examples such as:
>
> ***
>     (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> ***
> (4) exercising judgment in the enforcement of the criminal laws of the State,
> including, but not limited to, law-enforcement officers' arresting or attempting to
> arrest persons . . . .

*Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000) (emphasis in original).[17] As

---

[17] Although *Ex parte Cranman* was a plurality decision, the test for determining
state-agent immunity as restated in *Cranman* was adopted in *Ex parte Butts*, 775
So.2d 173, 178 (Ala. 2000).

Alabama Courts have noted, "By enacting [§ 6–5–338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. Indeed, '[t]his statute, by its terms, extends *state-agent* immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties.'" *Howard v. City of Atmore*, 887 So.2d 201, 203 (Ala. 2003) (internal citations omitted). Indubitably, Blanks's actions in drafting a search warrant affidavit and executing a search warrant in connection with third degree burglaries qualify as an "exercis[e of] judgment in the enforcement" of Alabama's criminal laws.

But the analysis cannot end here. The Alabama Supreme Court continued, "Notwithstanding anything to the contrary in the forgoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity [. . .] when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* (emphasis in original). At this point in the analysis, the burden shifts to Tillis, who must demonstrate the exception applies. *See Ex parte City of Montgomery*, 99 So.3d 282, 293–94 (Ala. 2012). To rise to this level, the Supreme Court of Alabama "has required the plaintiff to prove that the defendants' conduct was 'so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith.'" *Ex parte Tuscaloosa County*, 796 So.2d 1100, 1107 (Ala. 2000) (quoting *Couch v. City of Sheffield*, 708 So.2d 144, 153–54 (Ala. 1998)). The inquiry as to whether the state agent qualifies for immunity under this section is a fact-specific one. *See Ex parte*

38

*Dangerfield*, 49 So.3d 675, 682 (Ala. 2010).

It is settled that Blanks was engaged in official duties and exercising judgment in law enforcement. Tillis, however, argues Blanks acted in bad faith when he conducted a general, exploratory search of her home for stolen electronics. (Doc. 26, p. 27). She further asserts he engaged in willful misconduct or acted under a mistaken interpretation of the Fourth Amendment when drafting his affidavit. *Id.* at 27–28. "[The Supreme Court of Alabama] has previously held that poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*." *Ex parte Randall*, 971 So.2d 652, 664 (Ala. 2007); *see also Adams v. City of Mobile*, 2008 WL 4531768, at * 10–11 (S. D. Ala. Oct. 9, 2008) (applying this principle). As our sister court has noted,

> Where the complaint "fails to allege willfulness, malice, fraud, bad faith, or a mistaken interpretation of the law," state-agent immunity applies. *Knight v. Pugh*, 801 F. Supp.2d 1235, 1246 n. 6 (M.D. Ala. 2011). [. . .] [T]he only allegations made by plaintiff are that the defendants acted negligently.

*Jaggers v. City of Sheffield, Ala.*, No. 3:14-cv-158-TMP, 2014 WL 2123210, *7 (N.D. Ala. May 21, 2014). Because a police officer is immunized from liability for his negligent conduct, Count III must be dismissed.  Therefore, the Court **GRANTS** summary judgment in favor of Defendant Blanks on Count III of the Complaint.

## D. State Negligence Claim against the City of Selma

In Count IV of her First Amended Complaint, Tillis alleges the City "negligently, carelessly, or unskillfully failed to adequately train and supervise"

Blanks and similarly "failed to discipline [him] for his unlawful and unconstitutional conduct." (Doc. 8, ¶¶ 40–41). The City has invoked immunity under Ala. Code § 6–5–338, *see supra*. Historically, "no Alabama court has expressly recognized a cause of action against a municipality for a supervisor's negligent training or supervision of a subordinate." *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1258–59 (M.D. Ala. 2010); *Hamilton v. City of Jackson*, 508 F. Supp. 2d 1045, 1057–58 (S.D. Ala. 2007); *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314–15 (S.D. Ala. 2001). The Supreme Court of Alabama, however, recently acknowledged a negligent training and supervision claim against the City could stand on its own:

> The plaintiffs have asserted a negligent hiring, training, and supervision claim against the City. The City relies upon *Haynes*, [*City of Crossville v. Haynes*, 925 So.2d 944 (Ala. 2005)], and argues that it is immune from suit as to these claims. We note that the City has failed to identify the individual or individuals specifically charged with the hiring, training, and supervision of the police officers, much less whether the individual or individuals are police officers entitled to State-agent immunity. Therefore, the City has failed to carry its burden under *Cranman* and was not entitled to a summary judgment as to the negligent hiring, training, or supervision claims asserted against it.

*Ex parte City of Montgomery*, 99 So.3d 282, 299 (Ala. 2012); *see also Ex parte City of Midfield*, 161 So.3d 1158, 1169 (Ala. 2014) (reaffirming the principle that it is necessary for the municipality to identify whether the hiring, training, or supervising person is a police officer in deciding whether a municipality is immune). The need to identify the hiring, training, and supervising individual is based on the well-established principle that, "if a municipal peace officer is immune pursuant to § 6-5-338(a), then pursuant to § 6–5–338(b), the city by which he is employed is also

immune." *Montgomery*, 99 So.3d 282 at 298. As the City of Selma has failed to introduce any evidence, at this stage of the proceedings, identifying the individual(s) involved in these processes and whether they qualify for state-agent immunity, this Court is compelled to **DENY** its motion for summary judgment as to Count IV.

## V. Conclusion

For the reasons set forth above, the Court deems it proper to **GRANT** Plaintiff's motion for summary judgment (Doc. 14) as to Count I and to **DENY** her motion for summary judgment as to Count II. Further, the Court **GRANTS** Defendants' motion for summary judgment (Doc. 13) as to Counts II and III but **DENIES** the motion for summary judgment as to Counts I and IV.

The only issues remaining to be tried are 1) the damages on Count I and 2) liability and any resultant damages on Count IV.

**DONE** and **ORDERED** this 10th day of January, 2017.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE